W. SHARP, J.
Ernie and Carol Heina appeal from a final judgment rendered after a bench trial, which denied them any relief in their suit against Susan and Mario Miranda and Sundmacher Marketing Company. The lawsuit commenced as a result of deadlock in the management and the potential loss of the assets of two corporations; La Chu-cua Paso Fino Horse Farm, Inc., and La Chucua Land Company, Inc. (hereinafter jointly referred to as the La Chucua), *632 which were owned and operated by the Heinas and the Mirandas.
A receiver was appointed to conclude the La Chucua business and sell the assets after a trial judge determined corporate assets had been commingled with the Mi-randas’ assets and corporate assets were in danger of loss. After conclusion of that phase of the litigation, the Heinas proceeded to trial on their amended complaint, seeking various remedies against the Mi-randas and Sundmacher for breach of the stockholder agreements, individually and on behalf of La Chucua for conversion of corporate assets, imposition of a constructive trust, and accounting. The Mirandas asserted a counterclaim for funds owed La Chucua or Sundmacher and the Mirandas by the Heinas or La Chucua.
The trial court ruled that this was in the nature of a family dissolution, a joint business venture that had not worked out. He pointed out that the two couples came from disparate family backgrounds and cultures. He assigned the misunderstandings and distrust that led to the dissolution of the business to a dispute over “business judgment,” and determined the evidence did not support a derivative action or an action for breach of shareholder agreements. He noted there was little conflict in the testimony. After reviewing the record, we disagree that the Heinas were not entitled to prevail on various claims they asserted in this lawsuit and accordingly, we reverse.
The undisputed evidence and testimony in the record establish the following. The Heinas and the Mirandas became acquainted while Carol worked for Mario in a time-share business. In 1993, the two couples decided to form a joint venture to purchase, breed and sell Paso Fino horses. The income was planned to come primarily from the sale of foals, which Mario claimed had been profitable for him and Susan, or Sundmacher. Mario had experience and knowledge about the horse business and Paso Finos. Carol and Ernie had very little. Susan was primarily a housewife, who left all business decisions and arrangements concerning Sundmacher, as well as La Chucua, to Mario.
Susan was the sole shareholder, officer and director of Sundmacher, one of the defendants in this lawsuit. Sundmacher was formed as a vessel through which to channel their family income because Mario had income tax problems. Susan testified Sundmacher received commission income from the time-share business, and that it was a licensed brokerage, but she had no idea how it was set up or organized. She said Sundmacher leased horses owned by Susan and provided them for time-share prospective buyers’ enjoyment. Sund-macher also owned horses itself, but she was not clear which ones. It also paid horse showing and training expenses. When asked about Sundmacher and its business operations, Susan had to admit she had very little knowledge about it. She said Mario made all of the decisions and she let him run the business: “It’s just a family business.”
In 1994, the Mirandas and Heinas formed the La Chucua corporations. One corporation owned the horses, and the other owned the farm.[1] Although they were separate corporations, the parties operated them as a single entity. The shares were owned 50% by Susan, 25 % by Carol, and 25% by Ernie. Mario was not a shareholder because of his income tax problems. All four were the officers and directors of the corporations.
Identical (except reciprocal concerning Mario and Ernie) stockholder agreements were signed by the parties for each corporation. With regard to management, Paragraph six provided:
A. In order to simplify the operations of the Corporation, Mario [or Ernie, in the second shareholder agreement] as President of the Corporation, and Ernie [or Mario, in the second *633 shareholder agreement] are hereby delegated the responsibility for the day to day management and ministerial acts of the Corporation. Mario and Ernie shall have the right and power to bind the Corporation, subject to the conditions and limitations contained in Sub-paragraph 6(B) and elsewhere in this Agreement. The general management and final determination of all questions relating to the usual daily business affairs and ministerial acts shall rest in Ernie and Mario.
B. Mario, as President of the Corporation, and Ernie shall not have the authority to do any of the following (the “Major Decisions”) without first obtaining the affirmative vote or written consent of the Stockholders holding one hundred percent (100%) of the outstanding shares of the Corporation and the affirmative vote or turitten consent of one hundred percent (100%) of the Directors: (1) make, execute or deliver any deed conveying any of the Corporation’s property; (2) make, execute or deliver any contract to sell all or substantially all of the Corporation’s property; (3) make, execute or deliver for or on behalf of the Corporation any bond, indebtedness, mortgage, deed of trust, indemnity, bond or promissory note; (4) confess a judgment; (5) the assignment, transfer, pledge, compromise or release of any claim of the Corporation except for full payment; (6) The Corporation’s purchase of any Paso Fino horse; (7) the sale of any Paso Fino horse owned by the Corporation; (8) the declaration or distribution of any dividend, (emphasis supplied)
At first, the joint enterprise operated smoothly. Each couple contributed approximately $137,000 in assets, including cash and property to the La Chucua business. They acquired a twenty-acre parcel of land, subject to a purchase money mortgage, and built an eleven-stall barn, tack room, office, and other amenities. Ultimately La Chucua owned seventeen horses. Sundmacher (or Susan) owned at least eight other horses, including a stallion named Copiloto.
It was understood that each party would continue to work in his or her prior occupation. Ernie was employed as an executive with Westinghouse. He often had to travel outside the country to China. In the final year of operation of La Chucua, he was out of the country about half of the time, but when possible, he went to the farm on the weekends. Mario also continued to work in the time-share business and Susan remained primarily a housewife. They also went to the farm on the weekends. A full-time barn manager was hired to oversee the care of the animals and maintenance of the farm. Decisions were made jointly regarding the business operations, sale of horses and purchases.
From the beginning the businesses suffered from insufficient income to meet their operating expenses and to service the mortgage debt. Each month the parties added up the expenses and contributed equally to make up the shortage. There is a conflict in the testimony as to how many foals the business had for sale in 1995, but only one had been sold for $16,000. Ernie testified there were fifteen by the summer of 1995. However, the receiver reports show at least six other young horses (from one month to sixteen months) were in the inventory when the business was dissolved in 1995.
The Heinas became concerned that there were .so few sales of offspring and they suggested the framework of a business plan for the calendar year of 1995, which concentrated on marketing foals and increasing income. They objected to spending large sums of money, to train and show two La Chucua mares, Jazmin and La Metreletta, that were of show quality.[2] Mario insisted on the show horse *634 path, to which the Heinas agreed for a few months. Then they became discouraged. They insisted that Mario stop the training and showing of La Chucua horses, but he ignored them and continued to do so. Susan testified she was aware of the Heinas’ disagreement. Mario admitted he knew the Heinas objected to taking the show horses out of state for training and showing, but since Ernie only owned 25% of the shares, Mario felt he had the authority to do so. Because Mario claimed he had the unilateral right to make all management decisions for the La Chucua corporations, a deadlock was born.
The record also disclosed numerous self-dealings on the part of Mario to benefit Susan and/or her corporation, Sundmacher. The La Chucua horses were shown either under Susan’s and/ or Sundmacher’s name so no benefit publicity wise was ever achieved for La Chucua as a result of the shows. Further, Susan and Mario boarded and fed at least eight of Susan’s and/or Sundmacher’s horses (five brood mares, two colts and a stallion) at the La Chucua farm, without payment of any fee to La Chucua, for in excess of one year. The farm manager testified during the time he worked at La Chucua,[3] the Mirandas had seven horses they personally owned boarding for free at the farm.
Susan and Ernie testified they complained about this but Mario claimed he had the right to keep the horses there for free because he. was a director. He and Susan said there was never any question but that they were entitled to free board, but neither was able to explain why. Mario also told the receiver he and Susan owed nothing to La Chucua for the free boarding during the course of the receivership. Mario also pastured and fed two calves at La Chucua, without recompense to the joint venture business. Ernie testified, based on quotes from other farms nearby, the cost of boarding the Sundmacher horses there, rather than at La Chucua, would have been $20,000 to $28,000.
The Heinas stabled their horses at the Miranda’s facility before the barn at La Chucua was completed, but they paid board (approximately $200 per month). After the move to La Chucua, they had one or two horses at the La Chucua, but board was paid for one and the other was made available to time-share invitees for horseback riding. Ernie admitted the board paid for that horse was at a discounted rate, $99 per month.
Mario also insisted on breeding all of the La Chucua mares to the stallion Copiloto, owned by Sundmacher and/or Susan, and he charged La Chucua stud fees. Ernie agreed to two initial breedings, but he told Mario he wanted other breedings to be to other stallions with better blood lines. Mario ignored Ernie on this issue, and bred all of the La Chucua mares to Copilo-to.
Mario purchased a pickup truck for $1,500 for the farm and charged the Hei-nas one-half the purchase price as a contribution to the business. He claimed he would title it in the La Chucua corporate name, but he did not do so. Rather, it was placed in Sundmacher’s name. Later, he took the truck from the receiver, claiming it was his and traded it for a horse for Susan.
Mario also traded a $5,000 account receivable owed to La Chucua, for a full page advertisement in a horse magazine. The advertisement was for Copiloto — owned by Sundmacher.
Perhaps the last straw as far as the Heinas were concerned, was the sale of two La Chucua mares in foal, and two colts belonging to Susan or Sundmacher, to the Whitesides. The sales deal was worked out and agreed to solely by Mario and the buyers. Susan testified she had nothing to do with the sale, but she did agree to it. She said her husband works for her and represents her in all business matters.
*635 The day after the sale was consummated, the terms agreed to by Mario and the buyers, and the initial check written, Carol was told of the sale. Ernie was out of the country. Carol testified she was angry and upset and told Mario the prices set for the mares in foal was too low. Others testified she said “okay” and initialed the paper Mario had written out, which memorialized some of the terms of the sale made the prior day. However, the Heinas did not learn of the full details of the sales arrangement to the Whitesides until the receivership.
The evidence clearly disclosed that Ernie was not consulted about the sale before or after it was consummated. He testified he would not have agreed to the sales price, the commissions which were apparently paid to the farm manager and Mario, the interest-free, one-year payment terms, or transporting the horses for free using the farm manager as driver. The funds were paid to Sundmacher and at least $1,500 (or more) due to La Chucua was not paid to La Chucua.
Ernie testified, without contradiction, that after Mario refused to operate the business pursuant to the shareholder agreements, with joint decision making and control, the Heinas had no other recourse but to seek dissolution of the business and a receivership to carry it out. There were no provisions in the shareholder agreements for a voluntary liquidation. The Heinas asked the Mirandas to buy them out, but they refused because Mario had substantial IRS liens filed against him.
This proceeding began as a suit for dissolution of the corporations and institution of a receivership to preserve assets, in addition to counts for stockholder derivative suits, conversion, constructive trust, and breach of fiduciary duties. Mario admitted the grounds for the receivership, and the parties entered into an agreed final judgment of corporation dissolution and a receivership to wind up and dispose of La Chucua assets and business. At the time of the trial in this cause, that had been accomplished, but the other counts remained for disposition. In addition, Mario had filed for bankruptcy so the proceeding was stayed as far as his individual liability was concerned.
The pretrial stipulation recited the issues to be tried: a shareholder derivative claim for conversion against Susan (count two), a shareholder derivative claim for breach of fiduciary duty against Susan (count three), a count against Susan individually for breach of the shareholder agreement (count four), and a shareholder derivative suit against Sundmacher and Susan for an accounting and constructive trust (count five). The Mirandas also pursued their counterclaim against the Heinas and La Chucua, for breach of the shareholder agreement, breach of fiduciary duty, and claim for reimbursement of expenses to the Mirandas and Sundmacher. The trial court denied relief on all claims and counterclaims, denied attorney’s fees to any party, and retained jurisdiction for the continued liquidation and winding up of the La Chucua corporations. The Hei-nas appeal from this judgment; Susan and Sundmacher filed no cross appeal.
I. Breach of Stockholder Agreements.
The trial judge found that Mario failed to cooperate and act jointly with the Heinas in the conduct of the joint venture, as was provided for in the shareholder agreements. However, he discounted the disagreement over training and showing the horses by characterizing it as only a dispute over “a few thousand dollars,” and one concerning a matter of business judgment as to how to increase the value of the horses and market them. He found that Ernie was traveling out of the country and hardly in a position to assume full, equal responsibilities for management, “even though that is what the shareholder agreements called for,” and that the Heinas acquiesced in letting Mario run the business. He thus found no breach of the shareholder agreements.
*636 Our review of the evidence indicates that it is insufficient to support those findings. The shareholder agreements quoted above are very clear that joint management decisions had to be made by Ernie and Mario, and that at some point in 1995, Mario took total control, over the protests and objections, both written and verbal, of the Hei-nas. The showing and training expenses objected to by the Heinas far exceeded “a few thousand dollars,” at a time when the joint business had little income.
Further, the sale of the two La Chucua mares to the Whitesides constituted a clear breach of the shareholder agreements, which required the affirmative vote of all the shareholders and directors, prior to the sale of any La Chucua Paso Fino horse. Carol may have assented after the sale had been consummated, but Ernie did not agree to the sale, before or after it occurred.
The breach of the shareholder agreements was the primary reason that it became necessary to dissolve the La Chu-cua corporations, despite efforts to settle and negotiate a buy-out of the Heinas. Thus, only litigation could resolve the parties’ disputes. Mario clearly breached the agreements. Susan denied any culpability by claiming she delegated and authorized Mario to act for her, although she admitted she knew the Heinas were objecting to Mario taking sole control of the La Chucua business. In the face of such admitted knowledge, Susan, as a 50% shareholder, cannot escape her share of the blame. As such, it was error for the trial court not to enforce the attorney’s fee provision in the shareholder agreement, which provides for recovery of fees and costs to the prevailing party in the event of litigation (including appellate proceedings) against Susan.
II. Shareholder Derivative Claims Against Susan and Sundmacher.
The trial court found that the Hei-nas failed to prove by a preponderance of the evidence that Susan Miranda “sweetened the sale of her horses by discounting the La Chucua horses and including them in the sale to the Whitesides,” and thus it disallowed any claim for that transaction. However, the primary issue in regard to the sale is that it was contrary to the shareholder agreements and the claimed expenses or deductions were unauthorized. Further, the evidence disclosed that the full amount of the proceeds allocable to La Chucua for the sale of the mares was never received, by the La Chucua corporations, and that Susan’s corporation, Sund-macher, received the funds from the Whitesides. A full accounting should be made by Susan and Sundmacher, and a constructive trust imposed, if appropriate.
The uncontroverted evidence also disclosed that the truck purchased for La Chucua was wrongfully appropriated by Mario for Sundmacher, and its proceeds used to benefit Susan and/or her corporation, Sundmacher. These funds should also be accounted for, and a constructive trust imposed against Susan and/or Sund-macher.
Similarly, there was no dispute in this record but that Susan or Sundmacher received the benefit of a $5,000 account receivable that belonged to La Chucua. That also should be accounted for, reimbursed to La Chucua, and if necessary a constructive trust imposed against Susan and/or Sundmacher. Contrary to the finding of the trial judge, there was no other explanation offered for this transaction other than a misappropriation of property belonging to La Chucua.
Further, although the trial court found that there was considerable commingling of benefits from the La Chucua and the personal business of the Heinas and Mirandas, the evidence clearly established that the Mirandas, Susan and Sund-macher were the big winners. Susan and Sundmacher benefitted themselves at La Chucua’s expense by enjoying free board and shelter at La Chucua, for at least eight horses over a time in excess of one year, for no good reason. Although the *637 going rate for boarding horses in the area may have been too high a price to pay under the circumstances, clearly La Chu-cua is entitled to some recompense from the horses’ owners (Susan and/or Sund-macher) for this benefit they received. On remand, the issue of free boarding should be addressed, and La Chucua reimbursed.[4]
REVERSED and REMANDED.
DAUKSCH and COBB, JJ., concur.

. A 20 acre parcel, with a barn and outbuildings, fenced pasture and paddocks.

. Ernie Heina testified (without contradiction) that as much as $15,000 was expended on showing and training Jazmin, alone.

. Sixteen months from 1994 to July of 1995.

. Constructive trusts are imposed by operation of law where one wrongfully receives the property of another, Finkelstein v. Southeast Bank, N.A., 490 So.2d 976, 984 (Fla. 4th DCA 1986); generally, where fraud or a breach of trust occurs. In addition to the transfer of property, one must establish reliance, a confidential relationship, and unjust enrichment. Provence v. Palm Beach Taverns, Inc., 676 So.2d 1022, 1024 (Fla. 4th DCA 1996).